IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| **CROWN LABORATORIES, INC.,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| **AESTHETIC MANAGEMENT** ) | Case No. _____ |
| **PARTNERS, INC.; ERIC RACE; DAVID** ) | |
| **CARRAWAY; VALLERIE BROWN;** ) | Jury Trial Demanded |
| **JUSTIN GILDENPFENNIG; BRITTANY** ) | |
| **DESMET; ALEXIS TURNER; and** ) | |
| **JAMES GREER,** ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

In May, Plaintiff Crown Laboratories, Inc. ("Crown") acquired the ECLIPSE PRP product line. ECLIPSE PRP is a well-known medical device doctors rely on to care for their patients. Instead of building their own brand to compete against ECLIPSE PRP, Defendant Aesthetic Management Partners, Inc. ("AMP") opted for a shortcut, hiring former ECLIPSE PRP sales representatives who misappropriated trade secret customer lists from their former employer, which happened to be Crown's predecessor-in-interest to the ECLIPSE PRP brand. These sales representatives did this to unfairly enrich themselves and AMP.

Unfortunately, that is not all. AMP and its sales representatives compounded the harm caused by the misappropriated customer lists, deliberately seeding confusion in the marketplace by passing their PRP off product as Crown's, trading on the ECLIPSE PRP trademark, making false claims, and even hawking other old ECLIPSE accessories to customers. Crown brings this action to collect damages to make itself whole and to hold Defendants accountable for their illegal conduct.

1

## PARTIES, JURISDICTION, AND VENUE

1. Crown is a Delaware corporation with a principal place of business in Johnson City, Tennessee.

2. AMP is a Tennessee corporation with a principal place of business in Cordova, Tennessee.

3. AMP employs the following sales representatives and sales managers who are also Defendants in this action:

    a. Eric Race is an AMP employee and a resident of the State of Georgia. Upon information and belief, Mr. Race resides in the Atlanta, Georgia metropolitan area.

    b. David Carraway is an AMP employee and a resident of the State of Georgia. Upon information and belief, Mr. Carraway resides in the Atlanta, Georgia metropolitan area.

    c. Vallerie Brown is an AMP employee and a resident of the State of Georgia. Upon information and belief, Ms. Brown resides in the Atlanta, Georgia metropolitan area.

    d. Justin Gildenpfennig is an AMP employee and a resident of the State of Michigan. Upon information and belief, Mr. Gildenpfennig resides in the Detroit, Michigan metropolitan area.

    e. Brittany Desmet is an AMP employee and a resident of the State of Colorado. Upon information and belief, Ms. Desmet resides in Denver, Colorado.

    f. Alexis Turner is an AMP employee and a resident of the State of Colorado. Upon information and belief, Ms. Turner resides in the Denver, Colorado metropolitan area.

g. James Greer is an employee of AMP and a resident of the State of Tennessee. Upon information and belief, Mr. Greer resides in the Memphis, Tennessee metropolitan area.

4. This Court has personal jurisdiction over Defendants for the following reasons:

a. AMP's principal office is in Cordova, Tennessee. As an incentive to relocate its operation from California to Tennessee, AMP received $261,355 in economic incentives through the Economic Development Growth Engine or EDGE program administered by the City of Memphis and the County of Shelby, Tennessee. AMP employs at least two sales representatives in the State of Tennessee who promote AMP's products throughout the State. This Court has general personal jurisdiction over AMP. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). This Court also has jurisdiction over AMP under Tennessee's Long-Arm Statute, Tenn. Code §§ 20-2-222, 20-2-225, at least because AMP maintains a principal place of business in Tennessee.

b. Mr. Race, Mr. Carraway, Ms. Brown, Mr. Gildenpfennig, Ms. Desmet, Ms. Turner, and Mr. Greer (collectively, the "Defendant Sales Representatives") obtained employment from and are employed by a Tennessee company and committed tortious acts aimed at benefitting their Tennessee employer. The harms from Defendant Sales Representatives' conduct are absorbed in Tennessee, and within this judicial district. As a result, it comports with traditional notions of fair play and substantial justice for this Court to exercise specific personal jurisdiction over Defendant Sales Representatives. This Court also has personal jurisdiction over Defendants under Tennessee's Long-Arm Statute, Tenn. Code Ann. § 20-2-225.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391. AMP maintains substantial contacts with this judicial district such that it is subject to personal jurisdiction if this

judicial district were a separate State. Defendant Sales Representatives are subject to personal jurisdiction in the State of Tennessee, and in this judicial district, so venue is proper in this judicial district. Further, Crown's headquarters are in this judicial district.

6. This Court has federal question jurisdiction over this case. Crown brings claims under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, and under sections 32 and 43 of the federal Lanham Act, 15 U.S.C. §§ 1114, 1125. This Court has subject matter jurisdiction over these claims under 15 U.S.C. § 1121(a), 18 U.S.C. § 1836(c), 28 U.S.C. § 1331.

7. Because Crown's state law claims arise out of the same set of operative facts as the federal claims such that they would ordinarily be expected to be tried in one judicial proceeding, this Court has supplemental jurisdiction over Crown's state law claims against Defendants under 28 U.S.C. § 1367.

**FACTUAL BACKGROUND**

**I. Crown's Skin Care Business and its Acquisition of ECLIPSE PRP and Related Intellectual Property Rights**

8. Crown is a fully-integrated, global skin care company. Headquartered in Johnson City, Tennessee, Crown makes, distributes, markets, and sells well-known skin care products, including BLUE LIZARD sunscreen, PANOXYL acne wash, KERI lotion, and STRIVECTIN anti-aging products. Crown's brands have collectively generated more than a billion dollars in sales and billions of consumer impressions in the United States and around the world.

9. Through its Crown Aesthetics division, Crown makes, markets, and sells leading brands like SKINPEN, the first FDA-cleared microneedling device, and PROGEN PRP, a medical device that allows providers to recover platelet-rich plasma or PRP from their patients. Like Crown's other products, these aesthetics products are available throughout the United States

and around the world. Crown's aesthetic products have been recognized in media outlets like *USA Today*, *Good Morning America*, and *The View*.

10. Consistent with its commitment to innovation, Crown recently acquired the ECLIPSE PRP product line from Eclipse MedCorp LLC. Like PROGEN PRP, the ECLIPSE PRP product is a medical device system that includes a blood collection tube and centrifuge that allows clinicians to obtain PRP from patients. These health care providers then use the PRP to treat patients.

11. As part of the acquisition, Crown bought the ECLIPSE PRP trademark, including U.S. Trademark Registration No. 4920540 for ECLIPSE PRP, as well as all other intellectual property rights connected to the brand such as trade secrets and confidential information. As Defendants know well, the ECLIPSE PRP brand is valuable and recognized by the industry. Since ECLIPSE PRP initially came onto the market, the brand has been used in more than 800,000 patient cases, and generated millions of dollars of revenue in the United States and around the world.

12. Intellectual property is at the core of what Crown acquired. Crown's predecessor-in-interest to the ECLIPSE PRP brand included confidentiality obligations in its employee handbook. Each employee was required to review the handbook and sign a statement acknowledging the following:

> "Confidential Information" shall mean any and all information and materials that are proprietary to Eclipse or to any third-party licensor, the same having been acquired through the expenditure of time, effort and money, including, but not limited to, the following items and other items of a similar nature considered by the Company to be confidential and/or in the nature of trade secrets, whether or not reduced to a tangible medium:
>
> - business and marketing plans;
> - sales records;
> - price lists;

- pricing policies;
- market studies;
- financial and/or technical information;
- customer lists, supplier and/or business relationship names;
- discoveries, formulas, or patentable inventions;
- concepts and/or product plans;
- presentations and editorial material;
- technical handbooks, research and development materials, processes, procedures and know-how.

Confidential Information does not include any information publicly or generally known.

Additionally, as an Employee, you may become privy to confidential information of our customers and by servicing our customers, we are agreeing to keep their information confidential also.

All Employees are expected to protect the Company's confidential information at all times, including post-employment.

13. As shown above, Eclipse employees were specifically bound to guard the confidentiality of "customer lists" and "business relationship names," and those obligations did not end on termination, but rather extended "post-employment."

14. What is more, Ms. Brown, Mr. Gildenpfennig, Ms. Turner, and Mr. Greer each signed non-disclosure agreements with Eclipse MedCorp LLC in which these Defendants further acknowledged their obligations to maintain the secrecy of the information they learned in the course of their work for that company. Upon information and belief, these Defendants expressly agreed in those agreements that the identity of and contact information for Eclipse customers was confidential, protected information.

15. Crown maintains a trade secret protection program of its own, which includes the ECLIPSE PRP brand, and in which Crown has invested substantial financial resources. Among other things, Crown takes the following measures to protect its trade secret information such as customer lists and other sensitive business information:

a. Crown issues to its new employees an employee handbook that provides details regarding protection of confidential information;

b. Crown limits who has access to confidential information on a need to know basis;

c. Crown's information technology systems are protected by passwords and firewalls; and

d. Crown enters into confidentiality and non-disclosure agreements as a matter of course in exploring new business ventures and opportunities.

16. Crown does all of this to protect its business and proprietary technologies. This is particularly relevant with respect to customer lists, as one court explained:

> a customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested. Its use enables the former employee to solicit both more selectively and more effectively.

*Allergan, Inc. v. Merz Pharms., LLC*, No. SACV 11-446 AG EX, 2012 WL 781705, at *10 (C.D. Cal. Mar. 9, 2012) (internal citations and quotations omitted). If a competitor came into possession of a customer list, it could undermine Crown's hard-earned position in the marketplace, allowing the newcomer to freeride off years of Crown's efforts to develop its brands and customer followings. Maintaining trade secrets helps Crown protect its competitive advantage.

17. Crown also maintains an extensive quality assurance, regulatory affairs, and customer service program. Consistent with Crown's obligations under the federal Food, Drug, and Cosmetic Act, Crown qualifies its suppliers and ensures that products are produced in accordance with current Good Manufacturing Practices. Crown's customer service team is available to troubleshoot any issues customers have with their products to ensure satisfaction. All

this, built over many years and with millions of dollars in investment, is integral to Crown's overall, customer-centered approach to its business.

## II.     Defendants' Dual-Faceted, Illegal Unfair Competition Campaign

18.     To enter the PRP medical device market, AMP could have launched its own product line independent of Crown and the ECLIPSE PRP. Instead, AMP chose to engage in a dual-faceted campaign of unfair competition designed to undermine Crown's hard-earned position in the marketplace.

19.     The first component of the strategy was to entice former ECLIPSE PRP sales representatives to turn on the brand they once served. Mr. Race, Ms. Brown, Mr. Gildenpfennig, Ms. Desmet, Ms. Turner, and Mr. Greer all worked for Eclipse MedCorp LLC once, they promoted ECLIPSE PRP, and all were bound by the confidentiality obligations described above.

20.     Soon after leaving their prior employment, these Defendants started targeting former ECLIPSE PRP customers with surgical precision, contacting medical practices via phone and e-mail, tailoring their pitches of AMP products based on these customers' purchasing histories. AMP did not come by this information organically. Upon information and belief, without permission and in violation of their legal obligations, AMP's former ECLIPSE PRP sales representatives took customer lists and other sensitive ECLISPE PRP information with them when they left the company.

21.     By offering these former ECLIPSE PRP sales representatives new employment, AMP induced these violations. Upon information and belief, at a minimum AMP did not take steps to ensure that the former representatives did not bring any commercially sensitive, trade secret information with them to their new role. Upon information and belief, AMP knew or recklessly disregarded the possibility that AMP sales representatives might have brought this trade secret information from their prior employer.

8

22. The second facet of AMP's campaign involves a series of unfair and deceptive statements and acts, all designed to enrich AMP at Crown's expense. AMP chose to link its new Cellenis product to the ECLIPSE PRP mark. On May 23, 2022, AMP issued a press release announcing a partnership with Estar Medical. In the first sentence of that statement, AMP referred to Crown's ECLIPSE PRP mark, saying that "Estar Medical, the maker of ECLISPE PRP® and Tropocells®, has signed an exclusive long-term marketing and distribution agreement with [AMP], to sell its PRP products in the US market."

23. The press release is misleading. While ECLIPSE PRP was at one time manufactured by Estar, the product is no longer made by Estar, as the press release implies. Further, the reference in the release to "its PRP products" suggests that AMP would be selling ECLIPSE PRP products, which is not the case.

24. AMP President Adrian Bishop amplified the confusion in a video AMP published on Instagram. In the video, Mr. Bishop stated that AMP "completed an agreement with Estar Medical to offer the game-changing Cellenis PRP kits in the United States," and that "previously these kits were labeled under the ECLIPSE brand and they'll be under the global brand of Cellenis." Again, AMP chose to deliberately link the Cellenis brand to ECLIPSE PRP, suggesting that the Cellenis and ECLIPSE products are the same even though they are subject to differing production and quality practices and standards, and are part of entirely different customer support networks.

25. AMP's sales representatives have gone even further than the press release and Mr. Bishop's video. Mr. Race and Mr. Brown took to Instagram to claim that "[i]f that tube looks familiar, it's probably because you've been buying it from me and my team for the last 6 years." True and accurate screenshots of the posts are below.



To further drive the connection to Crown's federally-registered ELCIPSE PRP trademark, Mr. Race and Ms. Brown used the hashtag #eclipseprp.

26. On May 26, Mr. Race contacted a customer in Clarksville, Tennessee with a message. Noting that "there has been some confusion in the market based on another company's statement this week," meaning Crown's announcement of its acquisition of the ELCIPSE PRP brand, "I just wanted to make you saw this official announcement!" Mr. Race linked to the May 23 press release, claiming that "[m]y new company—Aesthetic Management Partners—is now the exclusive US distributor of the product formerly known as Eclipse PRP!" According to Mr. Race, "[t]his product cannot be sold or marketed by any other aesthetic company." The clear import of this statement was that no company, including Crown, could sell the ECLIPSE PRP product, which was false.

27. Additional AMP sales representatives took other, similar actions, including the following:

a. On May 25, Ms. Desmet told a customer in Flagstaff, Arizona that "nothing is changing when it comes to your PRP kits, better support, just a different logo." Again, this was false, as the support system for ECLIPSE PRP had changed.

b. Crown learned from a customer in the Dallas, Texas area that Mr. Carraway had represented himself "as the distributor for ECLIPSE PRP," which confused the customer.

c. Ms. Turner told a confused customer in Colorado that "nothing would change" regarding ECLIPSE PRP following Crown's acquisition of the brand.

d. Another customer in Denver, Colorado placed an order through AMP believing they would receive ECLIPSE PRP, and were confused to not receive that product. Upon information and belief, Ms. Desmet and Ms. Turner seeded this confusion.

e. Ms. Turner told a customer in Boulder, Colorado that it was "business as usual" after Crown's acquisition of the ECLIPSE PRP, and that the customer should continue ordering PRP tubes from her.

f. Ms. Turner told another customer in Denver, Colorado that Cellenis owns the rights to ECLIPSE PRP, and does not own the products connected to the brand. Ms. Turner recently took ECLIPSE PRP kits from this customer, and replaced them with Cellenis products. Ms. Turner claimed that AMP is "the new Eclipse."

g. A customer outside of Detroit, Michigan contacted Crown with an inquiry regarding an ECLIPSE PRP invoice. The customer's inquiry was misdirected, as the invoice was in fact issued by AMP, not Crown or Crown's predecessor-in-interest. Upon information and belief, Mr. Gildenpfennig, who services that territory for AMP, created this confusion in the marketplace.

h. In addition to the ECLIPSE PRP brand, Crown acquired the MICROPEN EVO brand. AMP sales representative Jim Greer recently told a customer in Tennessee that he has a "big box" of EVO accessories he was willing to sell to the customer. Mr. Greer does not have authorization to represent the EVO brand or any Crown products. Upon information and belief, Mr. Greer is selling remaining EVO accessories in his possession for profit.

28. These are only a sample of the actions of which Crown is aware. Upon information and belief, AMP, Defendant Sales Representatives, and AMP's other sales representatives have committed other illegal acts.

29. Both Mr. Race and Mr. Gildenpfennig know Crown and its products well. In September 2020, Mr. Race, while still working as a sales representative for ECLIPSE PRP, sent a Crown customer in Atlanta, Georgia a lengthy e-mail message in which he falsely claimed that Crown's PROGEN PRP device was not made in the United States. Mr. Race further falsely accused Crown of "intentionally misleading practices" with respect to its PRP medical devices.

30. In or around September 2021, Mr. Gildenpfennig told a Crown customer in Ohio that Crown's pioneering SKINPEN microneedling device lost its FDA clearance, and that the customer should instead purchase the product he was selling at the time. Mr. Gildenpfennig's representation, which was designed to enrich himself, was false.

31. These acts do significant harm to Crown. The confusion caused by AMP and its representatives have caused Crown to lose sales it would have otherwise made. At the same time, AMP's leveraging of ECLIPSE PRP trade secrets has given the company an unearned path to compete against Crown in the marketplace.

32. By letter dated June 5, 2022, through counsel, Crown wrote to AMP President Adrian Bishop regarding AMP's misuse of confidential information and false advertising,

demanded that AMP cease and desist of its misconduct, and demanded a response within seven days of their receipt of the letter. A true and accurate copy of the demand letter is attached hereto as Exhibit A.

33. The courier FedEx reported that Mr. Bishop signed for Crown's letter at 9:07 AM local time on June 7, 2022. Neither Mr. Bishop nor anyone else at AMP responded to Crown's demand letter. Upon information and belief, instead, AMP continues its illegal conduct, which is causing ongoing irreparable harm to Crown.

## COUNT I
### Misappropriation of Trade Secrets Under Federal Defend Trade Secrets Act
### 18 U.S.C. § 1836
### Against AMP and Defendant Sales Representatives

34. Crown realleges the foregoing.

35. Crown is the owner of valuable trade secrets related to products used in, or intended for use in, interstate or foreign commerce, to include the ECLIPSE PRP brand. Such information includes but is not limited to ECLIPSE PRP customer lists.

36. The customer lists and other competitive information described above are all "trade secrets" as this term is defined in 18 U.S.C. § 1839(3) because Crown and its predecessor-in-interest to the ECLIPSE PRP brand took affirmative steps to maintain their confidentiality and the company derives a competitive advantage from the material not being generally known.

37. Defendant Sales Representatives misappropriated Bellus Medical's trade secrets by acquiring them by improper means, including, but not limited to, by violation of their legal obligations to maintain the secrecy of the ECLIPSE PRP trade secrets.

38. AMP induced the Defendant Sales Representatives' actions by hiring them and by not taking affirmative steps to ensure that they did not take or use ECLIPSE PRP trade secrets in their work for AMP.

39. AMP either knew of the Defendant Sales Representatives' obligations to maintain confidentiality of the ECLIPSE PRP customers and sales histories or deliberately and recklessly disregarded the same. Upon information and belief, even after being informed of the Defendant Sales Representatives' confidentiality obligations, AMP continues to market and sell to accounts AMP obtained through misappropriation of trade secrets.

40. Defendants' misappropriation of Crown's trade secret and proprietary information constitutes a violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1).

41. Crown has been and is being damaged by the Defendants' misappropriation of its trade secrets. The damage to Crown includes, but is not limited to, loss of information, loss of the secrecy of the information, lost customers, lost business opportunities, and a disadvantaged market position. These and other damages suffered by Crown are irreparable.

42. Defendants' conduct has caused and will continue to cause irreparable harm for which Crown has no adequate remedy at law. Defendant should be enjoined from any continued use of ECLIPSE PRP trade secrets and should be enjoined from sharing the unlawfully retained information with others.

43. Crown is entitled to an award of damages in the amount of Crown's actual losses and Defendants' unjust enrichment, including attorneys' fees and costs.

### COUNT II
### Infringement of U.S. Trademark No. 4920540 for ECLIPSE PRP
### 15 U.S.C. § 1114
### Against AMP and Defendant Sales Representatives

44. Crown realleges the foregoing.

45. Crown owns U.S. Trademark Registration No. 4920540 for ECLIPSE PRP.

46. Defendants use the ECLIPSE PRP trademark in commerce, including but not limited to in the following ways:

a. In a press release disseminated to and through national outlets such as Yahoo! Finance;

b. In a video posted on Instragram;

c. As a hashtag on Instagram to customers to AMP's products; and

d. In health care provider offices in at least Georgia, Tennessee, Texas, Colorado, and Michigan.

47. Defendants' uses of the ECLIPSE PRP trademark occur in interstate commerce, including on the Internet.

48. Crown did not give Defendants permission to use the ECLIPSE PRP trademark.

49. Defendants' unauthorized use of Crown's registered trademark is likely to cause confusion among patients and health care providers regarding whether Crown is the source of, is affiliated with, or otherwise endorses AMP's products. This is particularly problematic because Crown and AMP's products travel in the same channels of trade and are marketed and sold to the same consumer base.

50. Defendants' actions damage Crown, including but not limited to by diverting sales of Crown's products to Defendants.

51. Defendants' actions constitute willful trademark infringement under 15 U.S.C. § 1117(a). Defendants were fully aware of Crown's trademark rights in ECLIPSE PRP and deliberately chose to use Crown's trademark anyway. Further, after being asked to stop their illegal conduct, Defendants willfully continued making and selling the product over Crown's express objections.

**COUNT III**
**Federal Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**
**Against AMP and Defendant Sales Representatives**

52. Crown realleges the foregoing.

53. Crown owns the ECLIPSE PRP and MICROPEN EVO trademarks which both designate the origin of the respective products connected to the same.

54. As alleged above, Defendants have committed numerous acts to create false associations between the ECLIPSE PRP and MICROPEN EVO brands and AMP products, including but not limited to the following:

    a. Falsely suggesting that ECLIPSE PRP is made by the same manufacturer as the Cellenis products;

    b. Falsely suggesting that ECLIPSE PRP is now under the global brand of Cellenis;

    c. Falsely suggesting that the ECLIPSE PRP and Cellenis products are equivalent, even though both products have different quality, regulatory, and customer support systems;

    d. Falsely stating that AMP is "the exclusive US distributor of the product formerly known as Eclipse PRP," and that "[t]his product cannot be sold or marketed by any other aesthetic company";

    e. Falsely stating that, after Crown's acquisition of ECLIPSE PRP, "nothing is changing" with respect to the brand;

    f. Falsely representing AMP as the distributor for ECLIPSE PRP;

    g. Falsely claiming that AMP is "the new Eclipse"; and

    h. Selling MICROPEN EVO accessories without authorization.

55. These false representations occurred in interstate commerce, as these acts took place in Georgia, Tennessee, Texas, and Colorado.

56. Defendants' actions falsely suggest that they are the source of ECLIPSE PRP and EVO products, and not Crown.

57. Crown is damaged by Defendants' actions. Defendants harm the goodwill Crown holds in the ECLIPSE PRP and MICROPEN EVO brands, undermining the source-identifying function of Crown's trademarks. Further, Defendants' actions make it likely that patients and health care providers will think Crown is affiliated with, connected to, or otherwise endorses Defendants and AMP products, putting Crown's name and reputation at risk by subjecting it to Defendants' control.

58. Defendants' actions were and are willful. Defendants were aware of the CROWN LABORATORIES trademark. Despite that, Defendants chose to pass off AMP products as ECLIPSE PRP and EVO products. Further, Crown apprised Defendants of its concerns, but Defendants chose to continue their practices anyway.

## COUNT IV
### Federal False Advertising
### 15 U.S.C. § 1125(a)(1)(A)
### Against AMP

59. Crown realleges the foregoing.

60. AMP made false and misleading statements regarding ECLIPSE PRP in commercial advertising, including but not limited to the following:

    a. Falsely implying, in a press release, that ECLIPSE PRP is still manufactured by Estar Medical, the maker of Cellenis;

    b. Falsely implying, in the same press release, that AMP would be selling Estars "products," including ECLIPSE PRP; and

    c. Falsely implying, in a promotional video broadcast on Instagram, that ECLIPSE PRP would be under the global brand of Cellenis.

61. Defendants published these false and misleading statements in interstate commerce through the internet.

62. AMP made these false and misleading statements regarding Crown's ECLIPSE PRP product.

63. These false and misleading representations were material, and actually caused and/or are likely to cause a substantial number of consumers to purchase AMP products instead of ECLIPSE PRP products, which harms Crown.

**COUNTS V-X**
**Unfair and Deceptive Trade Practices and State Unfair Competition**
**Tennessee, Tenn. Code Ann. §§ 47-18-104(b), 47-18-109**
**Colorado, Colo. Rev. Stat. §§ 6-1-105, 6-1-113(c)**
**Georgia, Ga. Code Ann. §§ 10-1-393, 10-1-399**
**Michigan, Mich. Comp. Laws §§ 445.903, 445.911**
**Ohio, Ohio Rev. Code §§ 4165.02**
**Texas Unfair Competition Law**
**Against AMP and Defendant Sales Representatives**

64. Crown realleges the foregoing.

65. As alleged above, Defendants have committed numerous unfair and deceptive acts that violate state laws in at least Tennessee, Colorado, Georgia, Ohio, Michigan, and Texas. Those acts include, but are not limited to, the following:

   a. Misappropriating ECLIPSE PRP trade secrets;

   b. Disseminating false and misleading press releases and advertisements out of AMP's Tennessee headquarters;

   c. Making numerous false and misleading representations in the field while promoting AMP products, including that AMP is the distributor of ECLIPSE PRP products;

   d. Falsely claiming that PROGEN PRP is not made in the United States;

   e. Falsely claiming that SKINPEN lost its FDA clearance; and

f. Selling MICROPEN EVO accessories without authorization, and outside the controls of Crown's quality assurance and regulatory systems.

66. Defendants' unfair and deceptive acts affect commerce.

67. Crown has suffered and is likely to continue to suffer harm

68. Defendants' actions are and were willful, and constitute unfair and deceptive trade practices under the above-captioned state laws and Texas unfair competition law.

69. Crown will suffer irreparable harm, for which a remedy at law will be inadequate, if the Court does not mandatorily enjoin Defendants, both preliminarily and permanently, (a) requiring them to cease using and turn over to Crown all ECLIPSE PRP trade secrets and confidential information, and (b) prohibiting them from marketing, selling, or promoting AMO products to customers identified in ECLIPSE PRP trade secrets and confidential information.

## PRAYER FOR RELIEF

WHEREFORE, Crown respectfully prays that this Court:

A. Enters a preliminary, to be followed by a final, Mandatory Injunction requiring Defendants to turn over and cease any and all use of any ECLIPSE PRP trade secrets or confidential information;

B. Enters a preliminary, to be followed by a final, Injunction prohibiting Defendants from marketing, selling, or promoting any AMP products to customers identified in ECLIPSE PRP trade secrets or confidential information;

C. Enters an Order that Defendants disgorge all their ill-gotten profits earned from the sale of AMP products connected to use of the ECLIPSE PRP trade secrets, confidential information, and trademarks and MICROPEN EVO trademark;

D. Awards Crown treble damages and attorney's fees under the federal Lanham Act;

E. Finds that Defendants committed willful trademark infringement;

F. Finds this is an exceptional case under 15 U.S.C. § 1117(a) and awards Crown its attorney's fees, expert fees, and court costs associated with bringing and prosecuting this action against Defendants;

G. Awards Crown its attorney's fees and costs; and

H. Grants any other relief this Court deems just and proper.

## JURY TRIAL

Crown requests a jury trial on all issues so triable.

Respectfully submitted, this 27th day of June, 2022.

By: */s/ James R. Lawrence*
James R. Lawrence, III (NC BPR No. 44,560*)
Anthony J. Biller (NC BPR No. 24,117*)
ENVISAGE LAW
2601 Oberlin Rd, Suite
Raleigh, NC 27608
Telephone: 919.755.1317
Facsimile: (919) 782.0452
Email: jlawrence@envisage.law
ajbiller@envisage.law

*pro hac vice pending

*/s/ Rebecca J. Ketchie*
Rebecca J. Ketchie (TN BPR 30785)
Issac B. Allman (TN BPR 305026)
Wilson Worley PC
2021 Meadowview Ln., 2nd Floor
Kingsport, TN 37660
Telephone: 423.723.0400
Facsimile: 423.723.0429
Email: rketchie@wwmgs.com
iallman@wwmgs.com

*Counsel for Crown Laboratories, Inc.*